UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ABE ROBINSON, JR.,

         Petitioner,

                     9:13-CV-00839

v.

                     (MAD/TWD)

TIM F. SHEEHAN,

         Respondent.
_____

APPEARANCES:            OF COUNSEL:

ABE ROBINSON, JR.
92-A-1027
Petitioner pro se
Marcy Correctional Facility
P.O. Box 3600
Marcy, New York 13403

HON. ERIC T. SCHNEIDERMAN      PRISCILLA STEWARD, ESQ.
Attorney General for the State of New York  LISA E. FLEISCHMANN, ESQ.
Counsel for Respondent          Assistant Attorneys General
120 Broadway
New York, New York 10271

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION</u>

   This habeas corpus proceeding commenced by Petitioner Abe Robinson, Jr. has been referred to this Court for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Northern District Local Rule 72.3(c), by the Hon. Mae A. D'Agostino, United States District Judge. For reasons explained herein, the Court recommends that the habeas Petition be denied and dismissed as time-barred.

I.   **STATE COURT BACKGROUND**

   A.   **Indictment, Conviction, Post-Trial Motion, and Sentencing**

On July 19, 1991, Petitioner was indicted on charges of murder in the second degree, Penal Law §§ 125.25(1) and (2), in connection with the strangulation death of his wife Thelma Robinson on July 1, 1991. (Dkt. No. 10 at 28-29[1].) Plaintiff was found not guilty of the intentional murder charge under Penal Law § 125.25(1) and guilty of depraved indifference murder under Penal Law §125.25(2) following a jury trial in Albany County Court. (Dkt. No. 12-1 at 208-09.)

Petitioner filed a post-trial motion to set aside the verdict for insufficiency of evidence to prove depraved indifference murder. *Id*. at 219. The gist of Petitioner's argument was that since he only wanted to hurt Thelma and not kill her, his actions supported a second degree manslaughter conviction, on which the jury was charged, but not a depraved indifference conviction. *Id*. at 219-28. The motion was denied prior to the imposition of sentence. *Id*. at 237.

Petitioner was sentenced to an indeterminate prison term of twenty-five years to life on January 23, 1992, and is presently in the custody of the New York Department of Corrections and Community Supervision. (Dkt. No. 12-1 at 271.) The judgment of conviction was entered on January 23, 1992. (Dkt. No. 10 at 31.)

   B.   **Direct Appeal**

The issues raised by Petitioner on his counseled direct appeal to the Appellate Division

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Third Department ("Appellate Division") from the judgment of conviction were: (1) there was insufficient evidence to support the depraved indifference conviction; (2) the trial court erred in admitting undisclosed physical evidence; (3) the trial court erred in denying Petitioner's motion to suppress; (4) the trial court erred in admitting rebuttal testimony; and (5) the sentence was harsh and excessive. (Dkt. No. 10 at 2.) On June 9, 1994, the Appellate Division unanimously affirmed the January 23, 1992, judgment of conviction against Petitioner. *See People v. Robinson*, 613 N.Y.S.2d 284 (3d Dep't 1994). Petitioner's counseled application for leave to appeal to the Court of Appeals (Dkt. No. 10 at 191-94) was denied on August 29, 1994. *See People v. Robinson*, 617 N.Y.S.2d 152 (1994). Petitioner did not file a petition for a writ of certiorari in the United States Supreme Court. (Dkt. No. 1 at 2.) His conviction therefore became final on November 28, 1994, ninety days after the Court of Appeals denied leave. (Dkt. No. 4 at 3.)

### C. State Court Motions to Vacate Conviction and Sentence Pursuant to CPL §§ 440.10 and 440.20

Petitioner represented in his Petition that he had not filed any post-conviction motions in state court. (Dkt. No. 1 at 2.) However, the state court record reveals that Petitioner filed two pro se post-conviction motions to vacate the judgment pursuant to New York Criminal Procedure Law ("CPL") §§ 440.10 and 44.20, respectively. (Dkt. No. 10 at 200-219, 224-233.)

#### 1. August 12, 2003, Motion to Vacate Judgment and Sentence Pursuant to CPL § 440.10

Petitioner's pro se motion under § 440.10 sought to have his conviction vacated on the grounds that the judgment was obtained in violation of his Miranda rights; ineffective assistance of counsel; defective grand jury proceedings; prosecutorial misconduct dealing with discovery,

3

Brady/Rosario material, impeachment, and exculpatory evidence; malicious prosecution; and an inconsistent verdict resulting in his unlawful imprisonment. (Dkt. No. 10 at 200-01.) Petitioner also argued as new evidence that his wife still being alive at the time she arrived at the hospital disproved intentional murder and depraved indifference, and the charges should have been modified to criminally negligent homicide. *Id*. at 215.

Petitioner's § 440.10 pro se motion was denied by Judge Herrick in Albany County Court on September 23, 2003. *Id*. at 220-23. The denial was based upon the County Court's determination that all of the issues raised by Petitioner could have and should have been raised on direct appeal. *Id*. at 221. The County Court also concluded that were it to consider the motion on the merits it would likewise be denied. *Id*. at 222. The Court specifically found that the fact that Petitioner's wife was still alive when she arrived at the hospital was not new evidence because it was in hospital records available to Petitioner at the time of trial. *Id*. The Court also found that Petitioner's claim that he was denied effective assistance of counsel was wholly conclusory with no corroboration, and that Petitioner's Sixth Amendment claim was in any event meritless. *Id*. at 222.

2. <u>October 2003 Motion to Set Aside His Sentence Pursuant to CPL § 440.20</u>

The grounds for Petitioner's pro se § 440.20 motion to set aside his sentence were that: (1) there was no entry of judgment in the transcribed sentencing minutes, and the Judge did not direct the Clerk to enter judgment in violation of CPL § 1.20(15); and (2) there was no certificate of conviction created or filed in violation of CPL § 380.60. (Dkt. No. 10 at 224.) The motion was denied by Judge Herrick on October 10, 2003, on the grounds that Petitioner had failed to raise the issues in his initial § 440 motion, mandating dismissal of the second motion. *Id.* at 234-

4

35. Petitioner's motion to renew or reargue, *id.* at 236-44, was denied by Judge Herrick on October 22, 2003. *Id.* at 245-46.

## II. HABEAS PROCEEDING

Petitioner filed his habeas corpus Petition on July 7, 2013, nearly twenty years after he was unsuccessful on his direct appeal and ten years after his second and last post-conviction motion. (Dkt. No. 1.) Petitioner has raised the following grounds for habeas relief: (1) the evidence was insufficient to support the intent element of second degree murder; (2) the trial court erroneously denied a motion to suppress evidence; (3) the sentence was harsh and excessive; and (4) he is actually innocent because no evidence of intent to kill was presented at trial, and based upon the evidence presented, he was guilty of second degree manslaughter. *Id.*

In a Decision and Order, dated September 18, 2013, Judge D'Agostino noted that the Petition appeared to be untimely under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and directed Petitioner to file a written affirmation within thirty days explaining why the statute of limitations should not bar his Petition. (Dkt. No. 4 at 4.) Judge D'Agostino instructed that "[i]f Petitioner is asking that the Court equitably toll the limitations period, he must set forth the facts establishing a basis for the application of equitable tolling [as described in the Decision and Order]." *Id.* The District Court cautioned Petitioner that "if he fail[ed] to comply with this order, or fail[ed] to ask for an extension of time to do so, this petition shall be dismissed as time-barred under 28 U.S.C. § 2244(d)." *Id.*

Petitioner filed an affidavit setting forth his argument that the statute of limitations should be equitably tolled on the grounds of his actual innocence because he only wished to "injure his wife so that she would look like someone who needed an order of protection, which he believed

5

was unjustly issued against him" and therefore did not act with depraved indifference in killing her. (Dkt. No. 5 at 5.) Judge D'Agostino thereafter issued a Decision and Order stating that upon review of the affidavit, "the Court will not dismiss Petitioner's petition as untimely at this time. Nor will the Court render any decision regarding whether the petition is timely and, if not, whether Petitioner is entitled to equitable tolling, until after Respondent has had an opportunity to respond to the petition and to the arguments made by Petitioner in his affidavit." (Dkt. No. 6 at 1-2.)

## III. ANALYSIS

### A. Statute of Limitations under the AEDPA

Under the AEDPA, a petitioner must file an application for a writ of habeas corpus within one year of his conviction becoming final. 28 U.S.C. § 2244(d)(1). A conviction becomes final for AEDPA purposes "when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expire[s]," that is ninety days after the final determination by the state court. *Williams v. Artuz,* 237 F.3d 147, 150 (2d Cir. 2001) (citation and internal quotation marks omitted). Prisoners whose habeas claims accrued prior to the enactment of the AEDPA, were afforded a one-year grace period after its effective date, until April 24, 1997, to file a habeas petition. *Bennett v. Artus*, 199 F.3d 116, 118 (2d Cir. 1999) ("we have held that prisoners whose habeas claims accrued prior to AEDPA's enactment are afforded the 'reasonable time' of 'one year after the effective date of AEDPA" to file a federal habeas petition) (quoting *Ross v. Artuz*, 150 F.3d 97, 102-03 (2d Cir. 1998)).

The statute of limitations may be tolled when a "properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."

6

28 U.S.C. § 2244(d)(2); *see also Fernandez v. Artuz*, 402 F.3d 111, 116 (2d Cir. 2005). However, a post-conviction challenge does "not reset the date from which the one-year statute of limitations begins to run. *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) ("If the one-year period began anew when the state court denied collateral relief, then state prisoners could extend or manipulate the deadline for federal habeas review by filing additional petitions in state court.") Furthermore, "a state-court collateral attack on a conviction cannot toll an already expired limitations period." *Bell v. Herbert*, 476 F.Supp. 2d 235, 244 (W.D.N.Y. 2007) (citing *Smith*, 208 F.3d at 13, 17.)

In this case, Petitioner's conviction became final on November 28, 1994, ninety days after the Court of Appeals denied his application for leave to appeal on August 29, 1994. *People v. Robinson*, 617 N.Y.S.2d 152 (1994). Because Petitioner's habeas claims accrued prior to the 1996 effective date of the AEDPA, he was afforded a one-year grace period until April 24, 1997, to file a timely habeas petition. Petitioner's time to file a habeas petition under the grace period had long since expired when he filed his two § 440 motions in 2003, and the filing of those motions did not reset the date from which the statute of limitations began to run. *Smith*, 208 F.3d at 17. Therefore, the § 440 motions had no impact on the April 24, 1997, expiration of Petitioner's time to file a habeas petition, and the Court finds that absent the applicability of the equitable exception for actual innocence discussed below, the habeas Petition now before the Court is time-barred.

    **B.**    **Equitable Exception to the AEDPA Statute of Limitations**

The AEDPA statute of limitations is not jurisdictional and is subject to equitable tolling

in appropriate cases. *Holland v. Florida*, 560 U.S. 631, 645 (2010).[2]  In *McQuiggin v. Perkins*, ___ U.S. ___, 133 S.Ct. 1924, 1931-36 (2013), the Supreme Court held that a credible showing of "actual innocence" under the standard announced in *Schlup v. Delo*, 513 U.S. 298, 329 (1995) could serve as a gateway for gaining review of an otherwise time-barred habeas petition.  The Second Circuit in *Rivas v. Fischer*, 687 F.3d 514, 530-43 (2d Cir. 2012), a decision cited in *McQuiggan*, had a year earlier recognized in *Holland's* wake "an equitable exception to AEDPA's limitation period in extraordinary cases . . . in which the petitioner has made a credible and compelling showing of his actual innocence," along with claims of constitutional error.[3]

In *Rivas*, the Second Circuit distinguished a plea to override the AEDPA limitations period based upon actual innocence from a request for equitable tolling, finding the actual innocence claim to be more accurately described as whether an "equitable exception" to § 2244(d)(1) exists in such cases.  687 F.3d at 547, n.42.  The Supreme Court, citing *Rivas*, adopted the term "equitable exception" in *McQuiggin*.  133 S.Ct. at 1931.

"To invoke the miscarriage of justice exception to AEDPA's statute of limitations, . . . a petitioner 'must show that it is more likely than not that no reasonable juror would have

---

[2] Under *Holland*, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 648 (quoting *Pace v. DiGugielmo*, 544 U.S. 408, 418 (2005)).  As pointed out by Respondent, Petitioner does not claim entitlement to equitable tolling under *Holland*, and the record does not suggest that he diligently pursued his rights or that some extraordinary circumstance prevented him from filing a timely petition.  (Dkt. No. 9-1 at 35.)

[3] Actual innocence serves only as a gateway to federal habeas review by allowing an otherwise untimely petition raising an independent constitutional challenge to be reviewed on the merits.  *McQuiggin*, 133 S.Ct. at 1928.  It does not, standing alone, warrant relief. *Id*.

convicted him in the light of new evidence.'" *McQuiggin*, 133 S.Ct. at 1935 (quoting *Schlup*, 513 U.S. at 327). The claim of innocence must be both "credible" and "compelling." *Rivas*, 687 F.3d at 541 (citing *House v. Bell*, 547 U.S. 518, 521, 538 (2006)). In order for a claim to be found credible, it must be supported by "new reliable evidence whether it is exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Schlup*, 513 U.S. at 324; *accord Rivas*, 687 F.3d at 541, 543 ("new evidence" is evidence not presented at trial). A claim of innocence is compelling if the petitioner proves that it is more likely than not that "any reasonable juror would have a reasonable doubt." *House*, 547 U.S. at 538; *accord Rivas*, 687 F.3d at 541. When a Petitioner presents new evidence, "the habeas court must determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (quoting *Schlup*, 513 U.S. at 327-28).

### C. Evidence at Trial Relevant to Petitioner's Equitable Exception Claim

#### 1. Events Leading Up to July 1, 1991

Petitioner and Thelma were married in 1950 and raised six children together. (Dkt. No. 11-2 at 151-58.) When the couples' youngest child turned eighteen, Petitioner told Thelma he was going to divorce her and had already contacted a lawyer. *Id*. at 191. The congregation elders in Petitioner's church intervened in the situation and told him that those of the Jehovah's Witness faith did not believe in divorce and encouraged him to try to find a way to continue his marriage. *Id*. at 192. Petitioner did not follow through on the divorce at that point. *Id.* Petitioner did, however, become involved with another woman, which led to his being disfellowshipped and thereafter shunned by the congregation. *Id.* at 193-95. After being disfellowshipped, Petitioner

told Thelma to move out of their bedroom, and thereafter the two had separate bedrooms. *Id*. at 198-99.

At the time Petitioner was disfellowshipped, Thelma and the two sons still living in the house were required by Petitioner to make monthly contributions for household expenses. *Id*. at 201-04. Thelma was required to pay $225 a month. *Id*. at 104. In May 1991, Thelma told Petitioner that since he was getting a divorce, she was not going to give him any more money. *Id*. at 224. When Petitioner came home from work that day and found Thelma in the bathroom, she again told him that she was not going to make any more contributions to household expenses. *Id*. at 225. Petitioner grabbed her and told her she could either pay or get out of the house. *Id*. When Petitioner grabbed Thelma, he pushed her, and she stumbled and fell up against the wall and bathroom cabinet. *Id*. at 226.

Following the incident, a church elder took Thelma to the State Police, and after being advised of the differences between Family and Criminal Court procedures, Thelma went to Family Court and was given a temporary order of protection (Dkt. No. 11-1 at 34-35, 181-82, 220-22, 226-27.) The order and a family offense petition were to be served on Petitioner personally or by mail by local law enforcement officials. *Id*. at 228.

On May 28, 1991, the day after the bathroom incident, Petitioner called home and informed one of his sons that he had told Thelma to have the household expense money when he got home or he was going to throw her out. (Dkt. Nos. 10-2 at 230-31; 11-2 at 226-27.) The son then heard Petitioner yelling and screaming at Thelma on the phone. (Dkt. No. 10-2 at 230-31.) The two sons who resided with Petitioner and Thelma decided in view of their father's conduct, they should stay home that evening. *Id*. at 231-32.

10

According to Petitioner, when he arrived home and discovered that his two sons were there, he knew there would be a problem and hid a french carving knife in his bedroom. (Dkt. No. 11-2 at 228, 230.) As he went back downstairs to tell Thelma to either pay or get out, his two sons became involved and stepped in between Petitioner and Thelma. *Id*. Petitioner's sons tried to reason with him, explaining that Thelma had gone to Family Court and a confrontation with her could result in his going to jail. *Id*. at 233. Petitioner said he did not care about any papers. *Id*. at 234

Petitioner retrieved the knife to let his sons know he would not tolerate any interference, and if they pushed it someone would get hurt. Id. at 230-31. When one of his sons approached him, Petitioner laid the knife across his chest and told him to back off. *Id*. at 229. Thelma walked out of the house when he told her to either give him the money or get out. *Id*. She went to the state police barracks. (Dkt. No. 10-2 at 240.) A trooper returned to the house with her, asked Petitioner about the knife, handcuffed Petitioner and took him to the barracks. (Dkt. No. 11-2 at 234-36.) Petitioner admitted the incident at the house to the troopers. *Id*. at 52.

The troopers suggested Petitioner leave the house for a few nights and took him back home to collect some belongings. (Dkt. No. 10-2 at 250-51.) Petitioner stayed in his mobile home a few miles from his home. *Id*. at 252; Dkt. No. 11-2 at 244-45. To the knowledge of Petitioner's son, Petitioner and Thelma did not see each other again prior to her death on July 1, 1991. (Dkt. No. 10-2 at 252.)

After Petitioner moved into his mobile home, he went to Family Court to see if he could have the court bar Thelma from the house as a result of her failure to make her monthly contribution and was told he could not. (Dkt. No. 11-2 at 248.) He was also told that the Family

Court order of protection did not prevent him from going home. *Id*. at 250. However, Petitioner was made aware that Thelma had obtained another protective order which did order him to keep away from his home when he appeared in Bethlehem Town Court in mid-June 1991 on the appearance ticket issued on the May 28, 1991 incident. (Dkt. No. 11-2 at 257-58.) Petitioner was supposed to appear in Family Court on the petition in that Court on July 2, 1991, and to appear again in Bethlehem Town Court around the same time. *Id*. at 270. On June 18, 1991, Petitioner was served with divorce papers. *Id*. at 65.

According to Petitioner, from late May until July 1, the date of Thelma's death, he had experienced anguish, insomnia, anger, and disgust. *Id*. at 266. At some point before July 1, 1991, Petitioner began to think about confronting Thelma for bringing on the living hell he was going through. *Id.* at 270. Petitioner decided to go to the house and confront Thelma because

> he had come to the conclusion that [she] had put [him] through misery, anguish, torment, and hell without a reason, without a basis, without a cause. There was no reason and call for what [he] was going through, and if [he] was going through this hell and this misery, then she should be punished and made to pay for it by being punished for it.
>
> And that if we were going to appear in court    if we were going to appear in court, then she had not been abused in the past by me, and since she had accused me of being abused and mistreated, then when she appeared in court, she would appear in court looking like what she had accused me of doing.
>
> So I figured that if she was in court crying, then she accuses me again of doing, at least this time she would have just cause because she would have been punished and would have had a whooping. It was [his] intention to give her a whooping for what she had did (sic) to [him].

(Dkt. Nos. 11-2 at 272; 12 at 1.)  Petitioner intended to give her an "ass whipping" as he had whipped his children in order to acquire discipline and control in the household. *Id*. at 3.

Petitioner testified at trial that he believed a wife to be subordinate to her husband, and she would have to be punished, which could include being beaten, if she did not follow her husband's rules and regulations. (Dkt. No. 12 at 32-36.) Petitioner admittedly had taken Thelma into the woods, slapped her a couple of times and whipped her with a belt in 1963 or 1964 after she had broken a house rule by arguing with him and holding up a knife in front of the children. *Id*. at 36-37.

    2.    <u>July 1, 1991</u>

During the days leading up to July 1, 1991, Petitioner worked out a plan to confront Thelma. *Id*. at 72. He first made sure his sons would not be at home. *Id*. at 72-73. As a part of the plan, Petitioner hid his car a distance from the house so that neither he nor the car would be seen when he went to the house, but the car would be in a place convenient for him later. *Id*. at 73. Petitioner was particularly concerned about being seen by a snoopy neighbor. *Id*. Petitioner jogged the quarter mile from where he had left his car to the house and waited in his bedroom for Thelma to come home. *Id*. at 74. Petitioner walked out of his bedroom to confront Thelma when she arrived home, startling her. *Id*. at 11. Petitioner asked her why she had called the police on him and did she not know from past understanding that she was "never, under no circumstances, in having an argument, dispute, or misunderstanding, to get the police involved in it." *Id*. According to Petitioner, Thelma responded "[w]ell, you wanted a divorce. Now you'll get your divorce and I'll take you for every damn thing you've got." *Id*. at 11-12.

In the late afternoon or early evening of July 1, a neighbor heard Thelma scream really loudly a couple of times. (Dkt. No. 11 at 48.) The neighbor went onto her porch about twenty

feet from Petitioner's house and hollered at Thelma asking her what was the matter. *Id*. at 48, 51. The neighbor heard another scream and then heard a man muttering but could not understand what he said. *Id*. at 48-49. It sounded to her like Petitioner, but she did not see anyone. *Id.* at 50. The screaming got lower and lower and eventually stopped. *Id*. 48-49.

One of Petitioner's sons arrived home at around 5:30 or 5:40pm and went in through the front door and called for his mother two or three times with no answer. (Dkt. No. 10-2 at 120-21.) He went upstairs looking for his mother and saw the carpet all scrunched up and in disarray and a Windex bottle on the floor in the bathroom. *Id*. at 122. It appeared to Petitioner's son that there had been a scuffle. *Id*. He then checked Petitioner's bedroom, which was usually locked, and found the door open. *Id*. at 123. When he opened the door, he saw his mother "face down on the ground with [his] father like perfectly placed on top of her. Even his feet were hooked over her, just sort of perfectly on top of her." *Id*. at 124. According to his son, Petitioner's left arm and shoulder were over his mother's left arm and shoulder down and around her neck. *Id*. at 124-25. The son stood over them and said "oh shit," which Petitioner claimed was the first thing he remembered after Thelma had told him she would take him for everything he had in the divorce. *Id*.; Dkt. No. 12 at 12. According to Petitioner, he was "confused, mixed up, or what," but then suddenly became aware that he was at home and one of his sons was there. (Dkt. No. 12 at 12.)

The son went outside and called the police. (Dkt. No. 10-2 at 126-27.) He went back inside about ten minutes later and got two butcher knives because he was going to kill his father, and when he went back upstairs, his father was gone. *Id*. at 130-32. The law enforcement officers who responded found Thelma on the floor, not breathing. (Dkt. No. 11-1 at 38-39.)

Efforts were made to resuscitate Thelma first in her home and then in the ambulance. (Dkt. No. 11 at 102-04, 107-09, 151-53.)

Law enforcement officials found Petitioner hiding in a closet covered with clothing. *Id*. 40-41. Petitioner waived his Miranda rights while still at the house. (Dkt. No. 11-1 at 44.) He remained silent when asked what had happened at the house. *Id*. at 45. Petitioner appeared to be oriented as to time and place. *Id*. He remained lucid while he talked to law enforcement at the police barracks where he was taken. *Id*. at 47-50. After it was read to him and he had indicated there were no errors, Petitioner signed a five page statement handwritten by law enforcement. *Id*. at 50-54.

In the signed statement Petitioner stated that the frustration had started building in him whenever he thought about the troopers taking him out of his house in handcuffs. He believed Thelma had taken his authority away from him and was running his life and home and turning the police and judge against him. *Id*. at 60-63. He described his plan for teaching Thelma a lesson by giving her an "ass whipping" and stated that an order of protection would not keep her from getting a whooping. *Id*. at 61. According to the statement, after his wife told him she would take him for everything he had, he "lost it," and "[f]rom that point on [he did not] really remember what happened" until he heard his son saying "oh shit." *Id*. at 62. At that point Petitioner realized he was on top of Thelma. *Id*. Petitioner told law enforcement that "[h]owever she got hurt, I guess I'm the one who hurt her. I was the only one there." *Id*. at 125.

### 3. Petitioner's Wife's Injuries and Cause of Death

The autopsy performed on Thelma showed bruises on her nose and several bruises on each of her cheeks. (Dkt. No. 11-2 at 74.) There were small hemorrhages in the white of her left

eye and in the right eye a more substantial hemorrhage which reflected trauma. *Id*. at 74-75. The autopsy showed bleeding into her liver, also consistent with traumatic injury. *Id*. at 81.

Fractures were found on ribs two through six on the right side and two through five on the left side. *Id.* at 78-79. The pathologist testified that location of the fractures was more consistent with blunt force trauma than efforts at resuscitation. *Id*. at 80, 104. While the pathologist acknowledged on cross-examination that the broken ribs were the ones usually injured in resuscitation and were consistent with resuscitation, she testified that the location of the rib fractures was unusual for resuscitation fractures. *Id*. at 106.

Thelma was found to have died as a result of manual strangulation. *Id*. at 84-85. The bleeding into her larynx, petechial hemorrhages in her eyes, and hemorrhages in the kidney area and in the membranes of the brain found during autopsy, which were found to be consistent with strangulation, supported the finding. *Id*. at 81-82, 105.

        4.      <u>Petitioner's Mental State</u>

At trial, Petitioner relied upon the testimony of a licensed psychiatrist who had examined him on two occasions for a total of nine hours to determine his mental state at the time he killed Thelma. (Dkt. No. 12 at 88, 94.) He determined with a reasonable degree of medical certainty that Petitioner's axis 1 diagnosis was major depression, first episode; axis 1B diagnosis was intermittent explosive disorder characterized by severe and extreme loss of control and aggressive and violent impulses; axis 2 was a personality disorder consisting of a combination of issues including that Petitioner was obsessive, rigid, demanding, became angry with people who did not meet his expectations, had trouble with trust and authority, was narcissistic, and had a high sense of self-importance; axis 3 was no significant mental illness; and axis 4 was that

Petitioner was suffering from an extremely severe degree of stress at the time of the crime. *Id*. at 97-98.

The psychiatrist opined that all of these combined amounted to a mental disease or defect, and that Petitioner had lacked the capacity to understand the nature and consequences of his action and that his actions were wrong. *Id*. at 107-08. The psychiatrist admitted that Petitioner was oriented as to time and place except between the time he spoke with Thelma and heard his son say "oh shit." *Id*. at 151-52.

There was rebuttal testimony from a psychologist at the jail where Petitioner was being held and a lay assistant forensic coordinator at the jail to the effect that Petitioner was not distressed, depressed or suicidal, that he had not had psychiatric treatment, and that he had no mental illness. (Dkt. No. 12 at 213-20, 225-32.)

### D. Analysis of Petitioner's Equitable Exception Claim

The Court finds that Petitioner's actual innocence claim does not support an equitable exception under *McQuiggan* that would provide a gateway for him to raise the insufficiency of the evidence, erroneous suppression of evidence, and excessive sentence claims in his Petition even though the Petition is time-barred.[4] Under *McGuiggan* the Petitioner's claim of actual innocence must be both "credible" and "compelling," and in order for a claim to be found "credible" it must be supported by "new reliable evidence" that was not presented at trial. *Schlup*, 513 U.S. at 324. Petitioner has failed to submit any new evidence in support of his equitable exception claim.

---

[4] As noted above, Petitioner's actual innocence claim, standing alone, does not warrant relief. *See McQuiggin*, 133 S.Ct. at 1928.

Other than the Petition, Petitioner's sole submission is the affidavit in support of his actual innocence equitable exception argument, which he filed in response to Judge D'Agostino's Decision and Order. (Dkt. Nos. 4 and 5.) In the affidavit, Petitioner relies entirely upon his testimony at trial that he "wished to injure his wife so that she would look like someone who needed an order of protection, which he believed was unjustly issued against him" in support of his actual innocence claim. (Dkt. No. 5 at 5-6.) According to Petitioner:

> trial evidence certainly could support the proposition that Abe Robinson acted recklessly, beating his wife justify (sic) what he felt was unfair treatment. But this view only supports the lesser charge of manslaughter in the Second Degree, penal law section 125.25(1). No proof or indicia was presented to show Abe Robinson had any fundamental disinterest toward the value of life. No testimony or inference founded the claim that Abe Robinson's conduct went "beyond being reckless" to a point intent to support the charge of second degree murder.

*Id*. at 6.

Petitioner has presented nothing more than a reiteration of the arguments made in his unsuccessful post-trial motion to set aside the verdict on the grounds that the evidence supported at most a second degree manslaughter conviction (Dkt. No. 12-1 at 219-28) and his unsuccessful direct appeal. (Dkt. No. 10 at 8-10.) In fact, the legal argument set forth in Petitioner's affidavit is taken largely verbatim from the legal insufficiency of the evidence argument in the counseled brief on his direct appeal to the Appellate Division. (*See* Dkt. Nos. 5 at 3-6; 10 at 8-10.)

Given the Court's finding that Petitioner's habeas Petition is time-barred under the AEDPA, and the absence of credible new evidence in support of Petitioner's actual innocence gateway claim as required under *McGuiggan*, the Court recommends that Petitioner's habeas Petition be dismissed as time-barred.

**WHEREFORE,** based upon the foregoing, it is hereby

**RECOMMENDED**, that the Petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED** in all respects on the grounds that it is time-barred; and it is further

**RECOMMENDED** that a certificate of appealability not issue with respect to any of the claims set forth in the Petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: April 19, 2016
Syracuse, New York

_____
Thérèse Wiley Dancks
United States Magistrate Judge